First case this morning is case number 4140546, Essig v. Advocate Bromenn for the appellate, Thomas Flora, and for the appellate, Richard Stites. May it please the court, counsel. I'll try to be brief. This is an unfortunate case where a young girl came in for a surgical procedure examination, ureteroscopy, where they would go up and look into her ureter for a kidney stone. There was no stone identified, but there was a stone inside the kidney per se, the calyces. There was an attempt to extract that stone. They used something called an electrohydraulic lithotripsy, injured the ureter, and subsequently attempted to get that stone out. They used a basket. The basket became entrapped. They had to cut the equipment apart, leave that in her for several weeks. She had a lot of complications and ultimately died several months later. This is an institutional negligence case. This is not a respondent superior case. We do not allege that a particular nurse did anything wrong per se. It's not like a nurse improperly placed an IV in or did something that deviated from the nursing standard of care. We allege institutional negligence against Broman. I argued the Lowe v. Provena case right here about 13 years ago. In that case, it was clear this court district held that an institution can be negligent above and beyond what a particular physician would be found negligent for, that the hospital has a duty. In this particular case, we presented expert testimony. We also alleged that the hospital had deviated from its policies and procedures by failing to obtain informed consent. And that point that you just mentioned, counsel, about the expert testimony, the case before us is on the grant of the defendant's motion for summary judgment. Is that correct? That's correct. So at the trial level, the defense made a motion for summary judgment and had various matters in support of it. And you responded to the motion for summary judgment and presented material to the court on why the motion should not be granted? Yes. Is my understanding correct that part of that at the trial level was Dr. Copeland's Section 2, 622 report? That is correct. And an affidavit. Well, in the brief, you make reference to that report as well several times in why there was a genuine issue of material fact and the trial court erred by granting the motion of summary judgment. Yes. But the reason I ask that is because, and you just mentioned an affidavit, the 2, 622 report isn't an affidavit. It's not verified. It is not. But we did also submit in the record an affidavit as well. Well, there's an affidavit from Dr. Copeland. Is that what you're referring to? Yes. That's different from his 2, 622 report, is it not? It is, but we incorporated, I think, with the affidavit, the 2, 622 report as well. Well, one of the aspects of affidavits in support of or in opposition to motions for summary judgment, as the Supreme Court mentioned in the Robidoux v. Oliphant case, which was a medical malpractice case, that affidavits submitted by purported expert witnesses must have contained there, too, as required by the rule, all written materials upon which the expert relied. Was that done in this case? I don't know the answer to that, Your Honor. Well, the record contains the report. I don't recall there being an affidavit incorporating that report or an affidavit that the 2, 622 report. More specifically, in the Robidoux case, a medical malpractice case, which affirmed the decision from this Court, the Supreme Court said strict compliance with Rule 191A is required, and there are no written materials submitted along with the report from Dr. Copeland, as required by Robidoux, regarding what he relied upon in his affidavit, as you call his affidavit. Well, I think the affidavit is different than the certificate of merit that is attached herewith. There were two different things. There were two certificates of merit, one specifically against Broman and one against the other defendants, as well as an affidavit that was submitted. As I recall, I don't have that affidavit in the materials here, but I believe it was referenced in the materials. I think the other point to bring out is, in an institutional case, the law is held, and we cited it in our brief. Well, counsel, let me be more clear. How can we give any weight, how could the trial court have given any weight, to any of the documents, whatever you want to call them? I don't think there was an affidavit from Dr. Copeland that incorporated the 2, 622 report, and I think that was different. How can we give any weight to it if it's in violation of Rule 191A, which says that strict compliance is required to make sure that all the written materials upon which the expert relied are attached thereto? Well, there is no requirement for an expert report in a claim based on institutional negligence. Rule 191A is a general requirement throughout the law of the State of Illinois, imposed by the Supreme Court, concerning affidavits submitted in support of or in opposition to motions for summary judgment. That's what we have in this case. It doesn't make any difference whether it's an institutional medical malpractice or a direct medical malpractice. It makes no difference. As a matter of fact, it could be any kind of action. If it's a 191A affidavit, this is what's required for it to be considered at all. To the best of my belief and knowledge as I stand here today, I believe there was an affidavit that we submitted by Dr. Copeland that incorporated that. That incorporated what? That incorporated the Certificate of Merit and the general explanation of what he had reviewed. Did it have attached thereto the written materials upon which he relied? I don't know the answer to that, Your Honor. I apologize. Counsel, you are saying there were two reports and an affidavit. I am saying that, yes. We go back to both his report and his affidavit and the allegations in the complaint. They can be tied up in the appendix at page 78 and 79. We go through what basically are the allegations in the complaint. At C, paragraph 28, count 5, that is where plaintiff alleges that the hospital deviated by allowing electrohydraulic lithotripsy when there was no consent given to it. It had never been explained. There had never been any discussion about EHL. Yet they proceeded to it and that is what we allege caused the injury and subsequent death. What do you think was missing from the consent? We have mentioned in the consent the manipulation of the stone and the doctor having the authority to take necessary action if there were some type of complication. What is missing here? They cite the general concept that in the standard consent form you can do whatever else you would like if we deem it necessary. We use the example, a hypothetical, that if a patient went in with a hangnail or toenail infection and put the patient to sleep and then the doctor decided, give me the amputation equipment. I'm covered under the general consent form that I can determine that I need to amputate this patient's foot. Now that would, of course, be a hypothetical that is no relevance. Well, that would probably be breach of the standard of care, right? Well, we would say no, you cannot do that. You could not amputate that patient's foot. That general, broad, informed consent would not come into play here. I guess where I see the difference here is even your expert said that the doctor going in and trying to explore to find out what's going on, and the doctor going in trying to remove, those weren't bad. Those were things that should have been done, but it was just a method used, basically. And so it's not a situation where they cut off someone's toe based on a hangnail. Our experts said that EHL, several of the experts said EHL should not have been used at all. It was archaic, and it was not the standard of care. There are several physicians, some of them the actual treating physicians here, and other experts that were retained. They said it shouldn't have been used at all. Should have used a homeom laser, the more up-to-date procedure. Should have stopped, not done anything. That is, of course, an issue of fact as to whether or not there was a blockage, whether there was an emergency. Our people say there was no emergency. They went up, the stone got stuck, they unstuck the stone, there was no blockage at that point, and then they said give me the EHL equipment and we're going to break this thing up. That's when we allege they should have said time out, we don't have any consent to do that. What about the doctor's decision, though, as compared to some kind of liability? Well, we go back to it's the hospital's equipment. The hospital has to take some ownership. If the hospital wants to, under Lowe, they have an independent duty to supervise and monitor, and their own policy says they have to have an informed consent, and they've got an informed consent policy, and their own policy says they have to do that. You can't be doing procedures on patients that have not consented. And that's where the hospital's duty was to say time out. Doctor, we do not have consent to use our EHL. So I know you want to use it, but nobody has informed the patient that we're going to do this. It has a higher risk. It has the highest risk of complications. We think that there was a duty by the hospital to inform that patient, inform the patient or her family, wake her up from the anesthesia and say time out. Do you want this or not? They didn't do that. They proceeded on. Are you arguing that the nurse should have overruled the doctor's decision? I'm not. I'm saying that the hospital's policy, they should have followed their own policy and should not have proceeded by giving a piece of equipment, allowing a piece of equipment to be used that had never been consented to. It was their equipment. I'm not saying it was the nursing function at all. It was the hospital's own policy that they should have followed. So the hospital is required to anticipate any potential complication and have someone supervising the doctor telling the doctor, no, that's not what you should do given the situation you're facing at this time? Yes, that's what their own policy says. Their own policy says we cannot do a procedure that has not been consented to. Not only do the policies say that, but the state law says that. Yes, it is. So consent means that they need to list every conceivable procedure that might be involved depending on what complication might arise. Well, that's where I think you get into the issue of fact. Our experts said that EHL should not have been used. Their experts say it was okay to do that. That's where we get into a battle of experts, but that's an issue of fact, and we cite that this was going to be a typical battle of the experts. Ours say, no, you shouldn't do that. Even the treating physicians say that. I want to just briefly touch on this foreseeability issue. We talked about the Paul's graph versus Long Island Railroad. I thought I was done with that case in medical school. It was interesting. The court did not find that the foreseeability issue was a problem against the physician. The court found that foreseeability and as a matter of law, the foreseeability as a matter of law, there was one step removed for the hospital, that it was too far-fetched. We don't think that's the case. We don't think that it has to be foreseeable that every complication would be foreseeable or every damage would be foreseeable. We think the court got it wrong, with all due respect to the court. That set into play, that injury, that tear, that leakage of the urine, and the ultimate blood clot that caused the death was all caused. We can trace it back to EHL, and that's what our experts opine. We think there was a tribal issue of fact on that, as well as the foreseeability issue is clear in Illinois, we believe. I'm happy to answer any other questions the court has. You said your experts said the procedure was dated, should not have been used. Which experts? We'll take Dr. Hatchett, for example, opined that in this day and age, EHL should not even be used. Should not be used at homeom laser, and that's one of the things that we've alleged that the hospital failed to make homeom laser available. That's the standard of care today, and that's what we allege. Dr. Copeland mentioned that as well. Copeland was the one that had the opinion against Bromant, and he's the one that said homeom laser should have been available, but Hatchett as well said homeom laser was the standard. Just to be clear, then, Hatchett, Drs. Hatchett and Green did not opine that Bromant was negligent or failed to conform to the standard of care? They did not. Hatchett was only on behalf or opining on Dr. Lange, the physician. Copeland was the only one that had the opinion on the hospital. Any other questions? Thank you. Thank you. You'll have rebuttal. Mr. Seitz? May it please the Court? We have 13 allegations of negligence here, as to which I've written in the brief, 20 minutes. I can spend my time going through those 13 allegations. You didn't raise any questions about the deficiency of the materials under 191A, did you? We did not. I'm just kind of curious about that. It seems to me that, especially given Robidoux v. Oliphant was a medical malpractice case and the last word, the definitive word of the Supreme Court on the point, how you missed it. What I would say, Your Honor, is that at the time that we were making the argument, the issue of, at least to the best of my recollection, the issue of using the affidavit in place. The 2622 report? The 2622 report. The 2622 report was not an affidavit. I understand. I'm trying to give benefit of doubt to counsel based on the way he's expressed it. It was really not the issue. The issue at that time was the deposition that had been taken of Dr. Copeland. That's what got mentioned in the summary judgment materials rather than just the 2622 and whatever you want to call it, the affidavit, 622. We were relying upon the deposition. The 2622 report was much more definitive than was the deposition and was cited much more extensively both before the trial court than to this court than the deposition probably for that reason. Yes, I think what we did essentially at the deposition, at least in my view, was we went through his opinions and found out which ones had no basis and of which there were several and essentially took them in our best attempt to take apart the 2622 affidavit. That's really how that particular component played in the totality of this situation. Mr. Kluwer, I don't think he said it equivocally, but at least he believes that there were two reports and an affidavit submitted from Dr. Copeland. Do you agree with that or do you not? My best recollection is that there is one and an affidavit. But you believe that Dr. Copeland did submit an affidavit? I think there was an affidavit that got submitted supplementally, if I remember right, at the time that Dr. Lang raised the issue. And I believe at that time there was an affidavit that got submitted. But because it involved Dr. Lang, frankly, I would be the first to confess my recollection on that topic is weak. Well, if there is such an affidavit, would it be in this record? It should be, yes. Because my belief is the totality of the record was ordered for production to this part. We see three primary issues. We, I think, are in low significant disagreement with plaintiff's theory as to what low means. I think the questions from the bench have suggested the idea that if you take the position of the plaintiff, you do have in real time the necessity to have a board member or some decisional officer constantly monitoring the activities of the physician. I don't think that's probably what has ever been stated by any court in the state, and I don't think it's good public policy. I don't think that's the route that any of the decisions from the courts of this state has gone. Now, having said that, do we understand that there is Darling? Do we understand that there are those issues? Yes. And, you know, hospitals around the state have modified procedures after Darling, and there's all sorts of procedural documents that exist in most hospitals. But I think the really key thing is that is missing, but not which the court has already alluded to, is what is this case? Is this case a situation where we had a consent and there was an emergency that occurred? That's what this case is all about. This case is not about that original consent signed by Katie Essig. The original, she got informed consent discussion at the Carl Clinic physical facility. She got it when there was a discussion at the hospital. She signed the consent, and in that consent it was not a broad-based consent that we can cut off toes and do anything we want to do. There has to be a finding, which Dr. Copeland agreed with, that there had to be an unexpected event, and Dr. Copeland said this was it. He agreed that this was an unexpected event. Now, he disagreed with the idea that Dr. Lange should have ever attempted to retrieve that stone in the kidney. We grant that. But that's not an issue of institutional negligence, which is all that plaintiff has indicated that they wish to pursue. As the court probably read in the brief, originally I had mistakenly believed it was a respondeat superior case and had filed my original motion for summary judgment on that basis and was corrected by plaintiff's counsel. So in the response, that's when we switched to talking all about the institutional negligence aspect of this case. The reality is that both as a matter of public policy and also in terms of the cases that have been decided by the courts of this state, we have a situation where the authority to make the decision in an unexpected outcome situation was given to the physician. It was not given to a board member. It was not given to an officer of advocate. It was given to this physician to be able to act as he saw fit associated with this situation. Now, you've no doubt read the testimony of Dr. Lange. He felt that he was doing the right thing or he wouldn't have done it. He felt that he had an unexpected outcome. And he had one which even Dr. Copeland agrees was one which posed a present danger, the inability of the kidney to send urine down to the bladder that justified the risk associated with EHL of which he was cognizant based on his training, background, and skills. There are brief references in the complaint to the fact that he was not qualified. The only evidence in the record before this court is that he had extensive experience with issues of this sort. And Dr. Copeland even acknowledged, I never got any materials from which to be able to justify anything I may have said in the 2622 about a lack of training, etc. So, in terms of that issue, I would just suggest to the court that the institutional negligence issue is of importance. It is a different standard that we recognize in Illinois. But it is one which cannot, as plaintiff wishes to, sort of go back to issues associated with what did Dr. Lange do. This is not a Lange issue. This is a what does the hospital have to do in terms of provision of equipment, for instance, unless this court is prepared to say that every hospital in the state of Illinois has to have a holmium laser or an extracorporeal shockwave lithotripsy, a term which I have learned now to say. Then, really, the situation that was set up was that there was an ability to obtain those if it was ordered in advance. But the whole issue here is that it was never anticipated to be used. So, from that standpoint, quite frankly, we had it available. Well, is it the doctor's decision to order such equipment? Yes. If he wants it there or she wants it there. That's correct. He would direct his office to ask the downstate lithotripsy, I think was the name, shockwave lithotripsy was the name of the entity that supplied this equipment. And then they would show up and the surgery would be scheduled for a day that they were available. So, and that wasn't done in this case. And why wasn't it done in this case? Because it was an emergency. There was no anticipation that this was going to be needed. I would like to briefly address the issue of proximate cause because I do think it has a role to play in this. Plaintiff has tended to focus on the fact that, well, how can an advocate get a finding that there's no proximate cause from the court when Lange didn't manage to achieve that finding? And I think the significant difference in the way I tried to express it in the brief was there's an additional factor if you're going to start talking about institutional negligence. There has to be a recognition or there should be a recognition on the part of the hospital that there's going to be a need for this kind of intervention, which basically means that the hospital has to sit in its judgment and make a determination as to all the possible adverse outcomes. And we're not talking about wild ones. We're not talking about cutting off toes and things of this nature because we all know that if you pick an extreme enough example, you can prove most anything. We're talking about normal day-to-day type operations. And in this case, I think it's fairly clear that there's no way that the hospital can reasonably hope to have envisioned this scenario and therefore somehow made a plan for this. It just is not likely, and that is the call of the trial court. It's not the call of the jury, I think was suggested by plaintiff. Proximate cause is an issue for the court according to the law of the state of Illinois. I have gone through on the 13 instances because, frankly, it was the only way I knew to approach the issue, given that I had to demonstrate to this court why I felt that it was the case that summary judgment was proper. I think that the common themes that exist in those 13 instances, well, apart from M, which was conceded, but A through L, the constant themes are either Dr. Copeland, at that position, acknowledged the position of advocate and agreed with the position of advocate, or he had no information upon which to base any decision or opinion that he might have associated with the opinion that had been rendered in the 2622, or alternatively, there just was a failure of evidence. There was just nothing. And in that instance, Kelly Cohn, R.N., was one of our witnesses whose testimony was uncontroverted when she would put in her evidence with respect to the issues associated with her experience, which is listed in the first paragraph of the materials that she presented for her opinion. It was the election of plaintiffs, not proposed by them or any of my experts, or those of Dr. Lange's decision, which is fine, but I don't think then there was a suggestion made in one of the briefs that there was never a fair opportunity to challenge Kelly Cohn's ability or credentials to be able to render the types of opinions that she had. Well, number one, we state them in her affidavit, which she signed, and secondly, if you're not going to take the deposition, then yes, you are probably not going to have an adequate opportunity to challenge those that were given. So we view that as simply being unrebutted testimony that obviously can form the basis for summary judgment by the trial court. If the court has any other questions, I frankly don't think I can state anything about the 13 allegations more clearly than I have done so in the brief, so I won't burden the court with that. Okay. Thank you, Mr. Steitz. Any rebuttal? With regards to the affidavit, I wanted to make sure I didn't make a mistake on the fact that the affidavit, the counter affidavit by Dr. Copeland was the record at C1381 and 1382. Additionally, in response to the motion for summary judgment, we attached Dr. Copeland's entire deposition, which is evidence that can be submitted to show that there is a genuine issue of material fact. I wanted to clear up to make sure that the court was clear. Dr. Copeland, we did submit two Certificate of Merits, 222 Certificate of Merits by Copeland. The first one did not include any allegations against Broman. The second one did. So I want to clarify that. It wasn't like he had two against Broman, and that is in the appendix. I think it's important to make clear that what the affidavits did and what the deposition did show was Dr. Copeland had an opinion that was directly contrary to Nurse Cohn. There was some discussion as to whether or not we needed a nurse or a doctor. We, again, don't believe under the law in Illinois that you need a nurse because this was institutional negligence. We don't think he even needed an expert because of the allegations of deviations from state law and their own policies. We think that in and of itself would have been enough to go forward with an institutional negligence claim, but we did have Dr. Copeland through his certificate and through his counter affidavit in the record. If the court has any other questions, I'm happy to answer them.